UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| KADEEM DESHAUN REESE,<br><br>Plaintiff,<br><br>v.<br><br>NANCY A. BERRYHILL,<br><br>Defendant. | Case No. 17-cv-06655-DMR<br><br>**ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. Nos. 22, 25 |

Plaintiff Kadeem Reese moves for summary judgment to reverse the Commissioner of the Social Security Administration's (the "Commissioner's") final administrative decision, which found Reese not disabled and therefore denied his application for benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 *et seq.* [Docket Nos. 22, 28 ("Pltf. Mot."), ("Pltf. Reply").] The Commissioner cross-moves to affirm. [Docket No. 25 ("Def. Mot.").] For the reasons stated below, the court grants in part Reese's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings.

## I.     PROCEDURAL HISTORY

Reese filed an application for Supplemental Security Income ("SSI") benefits on December 4, 2012,[1] alleging disability beginning December 15, 2011. Administrative Record (A.R.) 21. His application was initially denied on August 13, 2013 and again on reconsideration on February 12, 2014. A.R. 89-92, 96-101. On February 28, 2014, Reese filed a request for a hearing before an Administrative Law Judge ("ALJ"). A.R. 102-104. ALJ Bradlee S. Welton held a hearing on June 3, 2015.[2] A.R. 20-29. Reese did not appear for the hearing, although his counsel at that time,

---

[1] Reese's application for disability benefits is dated February 14, 2013 (A.R. 199), but the ALJ, Social Security Administration, and Plaintiff's counsel all state that the application date is December 4, 2012 (A.R. 20, 53; Pltf. Mot. at 5; Def. Mot. at 2.).

[2] The ALJ incorrectly stated that the hearing took place on May 3, 2015. A.R. 20.

Michael Wolchansky, appeared on his behalf. A.R. 38.

After the hearing, the ALJ issued a decision finding Reese not disabled. A.R. 20-29. The ALJ determined that Reese has the following severe impairments: cannabis abuse/dependence, cocaine abuse, posttraumatic stress disorder (PTSD), asthma, and depression. A.R. 22. The ALJ found that Reese retains the following residual functional capacity (RFC):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant must avoid concentrated exposure to fumes, dust, and other lung irritants. He is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production work requirements involving only simple, work-related decision-making, with few, if any, workplace changes, and no interaction with the public.

A.R. 23-24. Relying on the opinion of a vocational expert ("VE") who testified that an individual with such an RFC could perform other jobs existing in the economy, including an assembler, an inspector, and a photocopying machine operator, the ALJ concluded that Reese is not disabled. A.R. 28.

The Appeals Council denied Reese's request for review on September 18, 2017. A.R. 1-6. The ALJ's decision therefore became the Commissioner's final decision. *Taylor v. Comm'r of Soc. Sec. Admin.*, 659 F.3d 1228, 1231 (9th Cir. 2011). Reese then filed suit in this court pursuant to 42 U.S.C. § 405(g).

## II.    THE FIVE-STEP SEQUENTIAL EVALUATION PROCESS

To qualify for disability benefits, a claimant must demonstrate a medically determinable physical or mental impairment that prevents her from engaging in substantial gainful activity[3] and that is expected to result in death or to last for a continuous period of at least twelve months. *Reddick v. Chater*, 157 F.3d 715, 721 (9th Cir. 1998) (citing 42 U.S.C. § 423(d)(1)(A)). The impairment must render the claimant incapable of performing the work she previously performed and incapable of performing any other substantial gainful employment that exists in the national economy. *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 42 U.S.C. § 423(d)(2)(A)).

To decide if a claimant is entitled to benefits, an ALJ conducts a five-step inquiry. 20 C.F.R.

---

[3] Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit. 20 C.F.R. §§ 404.1510, 416.910.

§§ 404.1520, 416.920.  The steps are as follows:

1.    At the first step, the ALJ considers the claimant's work activity, if any.  If the claimant is doing substantial gainful activity, the ALJ will find that the claimant is not disabled.

2.    At the second step, the ALJ considers the medical severity of the claimant's impairment(s).  If the claimant does not have a severe medically determinable physical or mental impairment that meets the duration requirement in [20 C.F.R.] § 416.909, or a combination of impairments that is severe and meets the duration requirement, the ALJ will find that the claimant is not disabled.

3.    At the third step, the ALJ also considers the medical severity of the claimant's impairment(s).  If the claimant has an impairment(s) that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 [the "Listings"] and meets the duration requirement, the ALJ will find that the claimant is disabled.

4.    At the fourth step, the ALJ considers an assessment of the claimant's residual functional capacity ("RFC") and the claimant's past relevant work.  If the claimant can still do his or her past relevant work, the ALJ will find that the claimant is not disabled.

5.    At the fifth and last step, the ALJ considers the assessment of the claimant's RFC and age, education, and work experience to see if the claimant can make an adjustment to other work.  If the claimant can make an adjustment to other work, the ALJ will find that the claimant is not disabled.  If the claimant cannot make an adjustment to other work, the ALJ will find that the claimant is disabled.

20 C.F.R. § 416.920(a)(4); 20 C.F.R. §§ 404.1520; *Tackett*, 180 F.3d at 1098-99.

III.    **FACTUAL BACKGROUND**

A.    **June 3, 2015 Hearing**

Reese did not appear for the hearing before the ALJ that took place on June 3, 2015.  A.R. 38.  His attorney, Michael Wolchansky, stated that he had not been able to locate Reese, and that he believed Reese was currently homeless.  A.R. 39-41, 45.  Wolchansky represented that he had last spoken to Reese in February 2015.  A.R. 39.  The ALJ found that Reese had constructively waived his right to appear.  A.R. 38.  He further determined that he would issue a Notice to Show Cause to

Reese and give Reese ten days to respond. A.R. 38. Wolchansky responded to the request to show cause on Reese's behalf. A.R. 156-57. He represented that he had been out of touch with Reese since February 2015, and at that time, Reese did not have any forwarding address. A.R. 156-57. It appears that another hearing was scheduled for March 22, 2016 (A.R. 161-78) that was then continued to May 4, 2016 (A.R. 181-86). However, there is no information in the record about whether that hearing went forward or what happened at it, and it appears that the ALJ's decision in this case was based only on the proceedings of the June 3, 2015 hearing.

At the hearing, the ALJ reviewed Reese's prior work history to the extent it was available in the record. A.R. 43. Reese previously worked as a machinery assembler. A.R. 43. He also worked at California Conservation Corps doing grounds maintenance and road work; was a prep cook at Six Flags Discovery Kingdom; worked as a cashier at Dollar Tree; served as a barista at a coffee shop; and did gardening work. A.R. 43, 259-264. He last worked around 2010. A.R. 494. The ALJ posed a hypothetical to the VE based on the following assumed facts:

> Assume a hypothetical person with the same age and education as the claimant, that being 22 years of age with a GED. Further assume this hypothetical person has no exertional limitations; however, must avoid concentrated exposure to fumes, odors, dust, and poor ventilation. And work would be limited to simple, routine, repetitive tasks in a work environment free of fast-paced production requirements involving only simple work-related decisions with few, if any, workplace changes, and no interaction with the public.

A.R. 44. Based on the hypothetical RFC, the VE testified that such an individual could not perform any of Reese's prior positions. A.R. 44. However, she testified that there are other jobs in the labor market that a person with the specified limitations could perform, including as an assembler of electrical accessories, an inspector and hand packager, and a copy-machine operator. A.R. 45.

## B.    Relevant Medical Evidence

Reese has seen a variety of treating providers throughout the relevant time span. Since Reese only contests the ALJ's findings as to his mental impairments, the summarized history focuses on treatment and evaluations he received for those impairments.

### 1.    Adolescent Treatment Records [July - August 2006]

In July 2006, when Reese was 16 years old, the police were called to his residence. A.R.

380. His adoptive mother told the police that she had ordered Reese to leave the house after he "threatened vengeance on the family." A.R. 380. She said that he hated her and his three siblings and did not want to live with them anymore. A.R. 380. She also reported that the two of them had had a "troubled relationship" for a long time and that she feared that Reese would harm her or one of her children. A.R. 380.

Reese was referred by the police to a child psychiatric evaluation. A.R. 381-86. He told the social worker that he was separated from his biological mother at birth. A.R. 381. Reese stated that he entered foster care and his foster mother adopted him when he was five years old. A.R. 381. He said he had never felt accepted by his foster family, and that they did not care about him. A.R. 381, 384. He told the interviewer that he was always being blamed, called names, and belittled by the family. A.R. 384. He reported that his adoptive mother would slap him on the cheek over and over again. A.R. 384. Reese stated that he had done consistently poorly at school. A.R. 383. He also said he had thoughts of cutting his wrists in the ninth grade. A.R. 381.

During the examination, Reese reported depressive symptoms, including anhedonia, decreased energy, hopelessness, worthlessness, lack of concentration, suicidal ideation, and weight change. A.R. 382. His speech was slow, his mood was depressed, and he appeared to be tearful and angry. A.R. 382. He told the social worker that he does not feel like getting out of bed. A.R. 384. The social worker noted his mental status was otherwise within normal limits, and that he had fair insight and judgment. A.R. 382.

In August 2006, Reese saw another social worker. A.R. 385-86. He stated that he continued to have problems at home. A.R. 385. He blamed his adoptive mother for his losing a job. A.R. 385. He reported being upset that his adoptive mother had thrown some of his belongings outside and said that she had done this with some of his other belongings in the past. A.R. 385. He felt that he was always being told to leave the house. A.R. 385. Reese appeared well-groomed and relaxed, was pleasant and polite, and displayed humor. A.R. 385. He told the social worker that he was able to cook for himself and that he did his own laundry. A.R. 385.

Later in August 2006, Reese reported to the same social worker that his adoptive mother had again threatened to kick him out of the house. A.R. 385. He said that he consistently received

5

negative messages from her, and that she continued harass him even though he had been doing what was expected of him. A.R. 385. He felt that he was always blamed for everything, and that he constantly had to be on guard. A.R. 386. He agreed that he would continue to work on taking care of his responsibilities and avoid engaging in arguments. A.R. 386.

### 2. Adult Treatment Records [September 2009 – July 2014]

In 2009, Reese received treatment at the Sausal Creek Outpatient Clinic. A.R. 433-60. He completed an intake on September 14, 2009. The intake assessment notes that Reese complained of depression and insomnia. A.R. 453. He reported that he had been in foster care since birth and that he had been depressed since elementary school. A.R. 455. He informed the provider that he was currently homeless. A.R. 453. The intake notes that Reese appeared calm, not in distress and "just wants help." A.R. 455.

Reese was also assessed by psychiatrist Stuart Gluck, MD. A.R. 457-59. Dr. Gluck noted that Reese appeared alert, oriented, and engaged. A.R. 459. He had good grooming and normal speech. A.R. 459. His mood seemed depressed and anxious, and he had a sad affect. A.R. 459. His insight and judgment were good, and his thought process appeared logical. A.R. 459. Dr. Gluck assessed a diagnosis of depression (not otherwise specified). A.R. 459. He prescribed Reese Zoloft and trazadone. A.R. 459. she is to go to the city

Reese returned to Sausal Creek later that month for a medication refill. He reported at that time that the "medications work perfect" and he was able to sleep at night. A.R. 447. He returned for another medication refill on October 14, 2009, and again stated that the medications were working well. A.R. 441. On October 31, 2009, Reese returned to the clinic to report that the medication was too strong. A.R. 435. He said that the Zoloft gave him bad hallucinations, including hearing voices. A.R. 435. The treating RN assessed a GAF[4] score of 50[5] at that time. A.R. 438.

---

[4] "[T]he Global Assessment of Functioning ("GAF") Scale . . . attempts to quantify a patient's ability to function in daily life" on a scale from 0 to 100. *Cantu v. Colvin*, No. 5:13-cv-01621-RMW, 2015 WL 1062101, at *6 (N.D. Cal. Mar. 10, 2015); *see also* AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS, 27-34 (4th ed. 2000) ("DSM–IV"). The DSM-IV been replaced by the DSM-5, which eliminated the multiaxial system of diagnosis. The DSM-IV is discussed here because the ALJ used GAF scores to discount the medical opinions of Reese's examining providers. A.R. 27. Higher scores correspond with higher ability to function.

[5] A GAF score between 41 and 50 indicates "[s]erious symptoms (e.g., suicidal ideation, severe

The record is silent on whether Reese received mental health treatment between late 2009 and mid-2012. On September 5, 2012, Reese voluntarily presented to the emergency department of the Vaca Valley Hospital. A.R. 461-65. He reported homicidal ideation about his god-uncle. A.R. 461. Reese told the examining physician that he had a long history of physical and sexual abuse, and said that his god-uncle's verbal abuse gave him flashbacks about his prior abuse. A.R. 461. He stated that he had felt that he was going to kill his god-uncle, and he called the police, who put him on a 5150 hold and took him to the emergency department. A.R. 461. Reese said that he has used marijuana to "clear his past thoughts," but had otherwise not used drugs in over a month. A.R. 461. He tested positive for cannabis but his other drug screens were negative. A.R. 463. He said he did not use alcohol. A.R. 462.

A mental status exam recorded that Reese's behavior was anxious and he had minimal eye contact. A.R. 477. He was oriented but distracted, and seemed to have some difficulty with short- and long-term memory. A.R. 477. His mood appeared to be anxious and angry, and he had a flat affect. A.R. 477. Reese reported a past history of visual and auditory hallucinations. A.R. 477. He denied suicidal ideation at the time. A.R. 477. The mental health evaluation reported that he had a depressive disorder (not otherwise specified), and cannabis abuse. A.R. 478. The evaluator assed Reese's GAF at 50. A.R. 478. Reese was released the same day and discharged with a plan for follow-up care. A.R. 474.

In October 2012, Reese again presented for a voluntary psychiatric hold, this time at John George Psychiatric Pavilion. A.R. 479-91. He reported depression related to the stress of being homeless. A.R. 479. He said that he has suicidal ideation when he gets very stressed but has never come close to acting on those thoughts. A.R. 479. He reported that he cut himself with a knife when he was fifteen. A.R. 479. The intake evaluation noted that Reese sometimes has "racing thoughts and intensely self-critical voice-like thoughts but is clear that these are a product of his own mind and hasn't had any true auditory hallucinations." A.R. 479. Reese again recounted his history of child abuse as well as his adoptive mother's mistreatment. A.R. 479. He stated that he

_____

obsessional ritual, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV, at 34.

7

sometimes uses alcohol and regularly uses marijuana to help with his stress. A.R. 479. He denied other drug use. A.R. 479. Reese told the evaluator that he previously had taken Zoloft and trazodone, but had been off of them for the past year and a half. A.R. 479. The evaluation noted that Reese would "benefit from [a] night of respite" and that he agreed to try trazodone for his sleep again. A.R. 479. The intake notes indicated a diagnosis of major depressive disorder and a GAF score of 60.[6] A.R. 480. Reese was released the following day in stable condition. A.R. 481. His behavior was cooperative and calm although his mood was somewhat depressed. A.R. 481. His judgment seemed sound and he was alert and oriented. A.R. 481.

Reese received medical treatment from LifeLong Medical Care beginning in February 2013. A.R. 513-16. In April 2013, he met with LCSW Judith Rosenberg to seek weekly psychotherapy to explore his past history of trauma. A.R. 513-14. She noted diagnoses of PTSD, sleep disturbance, and bipolar disorder. A.R. 513. Ms. Rosenberg stated that Reese was clean and appropriately dressed and appeared oriented. A.R. 513. She wrote that he consumes alcohol occasionally and was not at that time taking medication. A.R. 513. Ms. Rosenberg assessed a GAF score of 55. A.R. 514. There is no evidence that Reese continued to receive psychotherapy.

Reese returned to LifeLong Medical Care on May 14, 2014. A.R. 554. He reported that he had previously taken trazodone and Zoloft, but stopped both medications. A.R. 555. He was restarted on Zoloft and referred for a psychiatric intake. A.R. 554. That intake took place on July 24, 2014, with Danielle Pyevich, MD. A.R. 546. Dr. Pyevich reported that his appearance was appropriate and he was oriented. A.R. 547. His behavior and psychomotor behaviors were unremarkable. A.R. 547. He exhibited excessive speech, an expansive affect, and a depressed mood. A.R. 547. His memory appeared intact. A.R. 547. He was cooperative but distracted and showed fair insight and judgment. A.R. 547.

Dr. Pyevich's treatment notes indicate that Reese's psychiatric treatment in the past was sporadic. A.R. 546. Reese reported that his mood had been intermittently depressed for many years, although his symptoms had recently become worse due to many stressors, particularly his housing

---

[6] A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers, or co-workers)." DSM-IV, at 34.

1   situation and relationship conflicts.  A.R. 546.  He described psychological symptoms including

2   disrupted sleep, poor appetite, and irritability, although his energy and concentration were fairly

3   good.  A.R. 546.  He also reported having nightmares, flashbacks, and hyperarousal symptoms

4   related to previous trauma.  A.R. 546.  The treatment records indicate that Reese had used cocaine

5   over the past four months, and his last use had been a few weeks prior.  A.R. 546.  He told Dr.

6   Pyevich that he had used marijuana regularly since childhood and he occasionally drank alcohol,

7   but he denied having substance abuse or dependency issues.  A.R. 546.  At the time of the intake,

8   Reese was taking Zoloft and had recently increased his dose with a positive response.  A.R. 546.

9   Dr. Pyevich assessed diagnoses of PTSD, depressive disorder, cocaine abuse, and marijuana

10  use/dependency, ruling out Bipolar II.  A.R. 547.  She noted that Reese had previously been assessed

11  a GAF score of 55.  A.R. 547.

### 3.        Function Reports

#### a.        Self Report

14  On May 7, 2013, Reese submitted a function report.  A.R. 269-76.  With regard to his

15  physical limitations, Reese reported that he suffers from headaches, and that he cannot walk, run, or

16  stand for more than 30 minutes.  A.R. 269.  He stated that he is no longer able to skateboard, run for

17  long times, or lift heavy items.  A.R. 270.  Reese wrote that he has difficulty lifting, standing,

18  walking, sitting, climbing stairs, squatting, reaching, seeing, hearing, and talking.  A.R. 274.  He

19  can walk for about 30 to 40 minutes before he needs to take a break for twenty minutes.  A.R. 274.

20  Reese reported that he uses a wheelchair, a cane, a hearing aid, and glasses, although none of these

21  were prescribed to him by a doctor.  A.R. 275.

22  Regarding his mental limitations, Reese reported that he has difficulty with his memory and

23  concentration, completing tasks, understanding, and getting along with others.  A.R. 274.  He wrote

24  that he has difficulty sleeping because of the stress and pain.  A.R. 270.  He stated that he needs

25  reminders to complete tasks and go to appointments, and that he can only pay attention for about 10

26  minutes.  A.R. 271, 274.  Reese reported that he does not finish tasks that he starts.  A.R. 274.  He

27  wrote that he cannot follow spoken instructions very well, but he can follow written instructions.

28  A.R. 274.

9

Reese reported that his daily activities include waking up, showering, dressing, eating, taking walks, listening to music, going to church, riding his bike, reading the Bible, and spending time with his fiancé. A.R. 269. He prepares his own meals daily and tries to eat healthy. A.R. 271. He completes some housework, including washing dishes, making his bed, picking up food, and paying the bills. A.R. 271. Reese wrote that he needs reminders and encouragement to complete these activities. A.R. 271. He reported that he can handle his own money, except that he has difficulty saving money on his own. A.R. 272. He has no problem with performing basic personal care, such as dressing and bathing. A.R. 270.

Reese stated that his hobbies include watching DVDs, listening to music, cooking, and going for walks, but that he does not do these activities often. A.R. 273. He goes outside two or three times a week and goes shopping on his own. A.R. 272. He attends church sometimes and stated that he needs reminders to do that and someone to accompany him. A.R. 273. Reese wrote that he does not spend time with other people, and he has difficulty getting along with family, friends, and neighbors because he has a "bad attitude." A.R. 273-74. He reported that he gets along "ok" with authority figures, and has never been fired or laid off from a job because of problems getting along with other people. A.R. 275. At the time he wrote the report, Reese was not taking any medication. A.R. 276.

### b. Third-Party Report of Monique Agnew

On May 6, 2013, Monique Agnew submitted a third-party function report on behalf of Reese. A.R. 249-58. She identified herself as Reese's fiancé and wrote that she had known Reese for three years. A.R. 249. Agnew and Reese lived together in an apartment at the time that she submitted the report. A.R. 249. She wrote that she and Reese spend time together on a daily basis. A.R. 249.

With regard to Reese's physical limitations, Agnew reported that Reese suffers from cold sweats, back pain, leg pain, and headaches. A.R. 250. He has problems with lifting things, standing, walking, sitting, climbing stairs, kneeling, squatting, seeing, hearing, and talking. A.R. 255. He can walk for about an hour and a half before he needs to rest for 30 minutes or more. A.R. 256. Agnew opined that Reese needs to use a walker, hearing aid, and glasses, but that these aids had not been prescribed by any doctor and they were "looking into getting support that will provide [Reese]

10

with assistance." A.R. 257.

Regarding Reese's mental limitations, Agnew stated that his "major depression mental illness causes mood swing." A.R. 250. He handles stress "ok but has anger at times," and sometimes exhibits "hyper anxiety." A.R. 257. Agnew reported that Reese has difficulty with his memory and concentration, completing tasks, understanding and following instructions, and getting along with others, although she wrote that he gets along "fine" with authority figures and that he talks to visitors when they come over. A.R. 255-56. Agnew stated that Reese can pay attention for over an hour but does not always finish what he starts. A.R. 256. She reported that he sometimes needs to hear spoken directions multiple times in order to understand them, and that he can follow written instructions better. A.R. 256.

Agnew wrote that Reese's daily activities include eating, running errands, paying bills, going to the store, smoking cigarettes, reading books, watching movies, and listening to music. A.R. 250. Reese prepares at least some of his own meals, about once "every couple of days." A.R. 252. He also washes the dishes, cleans counter top surfaces, takes out the trash, and sweeps the floor, but cannot do more than light duties because of his back pain. A.R. 252-53. He can handle his own money. A.R. 254. Agnew stated that Reese can go out in public alone, usually walking or using public transportation. A.R. 253. He shops for groceries and various household items in stores. A.R. 254. Agnew reported that Reese leaves the house about once a week and does not drive. A.R. 253. He attends church once or twice a month. A.R. 255. According to Agnew, Reese does not have any problems getting along with family, friends, neighbors, or other people. A.R. 255.

Reese has difficulty maintaining regular sleep (sometimes sleeping too long, and sometimes not being able to sleep) and only "eats when he can eat." A.R. 250-51. Agnew stated that he needs reminders to maintain his hygiene, attend appointments, and to eat healthier. A.R. 252. He also needs help and encouragement to complete his chores. A.R. 253. Agnew reported that Reese has problems with his short-term memory. A.R. 251.

#### 4. Rosemarie Ratto, PhD

On March 13, 2013, Rosemarie Ratto, PhD, performed a psychological evaluation. A.R. 507-512. Reese presented with irritability, significant stress, agitation, migraine headaches, mood

swings, and concentration problems. A.R. 507. He told Dr. Ratto that he was unable to perform household chores because of his emotional and physical problems. A.R. 507. He stated that he has a history of problems handling money, and has significant difficulty interacting with others because of his anger. A.R. 507. He is frequently argumentative. A.R. 507. He reported that he had stopped taking Zoloft and trazadone due to side effects and because he believed it was ineffective. A.R. 508. Reese told Dr. Ratto that he had previously experimented with abusing pain medications, and used ecstasy, cocaine, and heroin between the ages of 18 and 20. A.R. 508. However, he stated that he had not used those drugs since that time. A.R. 508. He reported that he used alcohol minimally and currently used marijuana for medical purposes. A.R. 508. Dr. Ratto noted that Reese was an adequate historian. A.R. 507.

On examination, Dr. Ratto noted that Reese was marginally groomed with poorly kept hair and long nails. A.R. 508. His gait was in normal limits and he was oriented. A.R. 508. He was able to repeat three out of three words immediately, and two out of three after a short delay. A.R. 508. He could not complete serial sevens backwards and was unable to spell the word "world" backwards, although he could recite up to five digits forward and up to four digits backward. A.R. 508. He did not appear to have speech or language comprehension difficulties. A.R. 508. Reese's mood appeared angry and anxious, and he displayed pressured and rambling speech about his past traumas. A.R. 509. He reported a long history of depression since childhood with current feelings of irritability, agitation, mood swings, and significant stress. A.R. 509. Reese told Dr. Ratto that he had significant difficulty sleeping because of nightmares and night sweats. A.R. 509. He also said that he had problems with his appetite and lost significant amounts of weight. A.R. 509. Reese acknowledged problems with concentration and motivation. A.R. 509. He reported having suicidal thoughts in the past and constant thoughts of wanting to hurt others but said that he had no plans to harm anyone. A.R. 509. He told Dr. Ratto that he has paranoid thoughts, hears voices daily telling him to harm people, and used to have visions of "dead things." A.R. 509.

Dr. Ratto administered a battery of tests, including the Wechsler Adult Intelligence Scale ("WAIS") IV, the Bender-Gestalt II, Trails A & B, and the Beck Depression Inventory ("BDI") II. On the WAIS-IV, Reese obtained a full-scale IQ of 82, which is in the low average range. A.R.

510. Dr. Ratto noted that "[h]e demonstrates adequate abilities on his verbal skills" but has impairment with respect to his visual spatial problem solving skills and "significant weaknesses [in] his ability to retain information, concentrate, and pay attention." A.R. 510. The Bender-Gestalt II also indicated that Reese has "low average abilities on visual-spatial perceptual tasks." A.R. 510. His performance on Trails A & B showed "adequate abilities on the simple tracking task, but impaired functioning on the more complex visual tracking task." A.R. 510. Dr. Ratto wrote that Reese's overall immediate memory fell in the bottom 10% range. A.R. 510. Reese's results on the BDI-II showed "severe feelings of depression," including endorsements of significant sadness, pessimism, guilt, failure, loss of pleasure, self-blame, agitation, loss of interest, irritability, fatigue, loss of energy, and indecisiveness." A.R. 510. Reese also acknowledged long-term feelings of significant depression with suicidal thoughts, poor motivation, problems sleeping, mood swings, agitation, and problems interacting with others. A.R. 510.

With respect to Reese's functional limitations, Dr. Ratto opined that Reese has mild to moderate impairments in his ability to understand, remember, and carry out short and simple instructions and his ability to maintain adequate pace and persistence to perform simple tasks. A.R. 511. She noted that he has moderate to marked impairments in his ability to understand, remember, and carry out detailed instructions. A.R. 511. She also opined that he has marked limitation in the following areas: ability to maintain adequate pace and persistence to perform complex or detailed task; adapt to changes in job routine; withstand the stress of a routine work day; and interact appropriately with coworkers, supervisors, and the public on a regular basis. A.R. 511.

Dr. Ratto wrote that Reese displays "significant impairment in his visual spatial problem solving and significant weaknesses [in] his ability to concentrate, pay attention, and retain information." A.R. 511. She opined that these cognitive impairments may be due to his severe feelings of depression and anxiety as well as documented long-term cognitive deficits. A.R. 510. Dr. Ratto noted that Reese's emotional and cognitive problems appear long-term, beginning in childhood, and are "likely related to past organic issues as well as abuses that have occurred throughout his life." A.R. 511. She stated that his "[r]ecent traumas with homelessness appear to be compounding his long-term emotional problems." A.R. 511. She opined that Reese's symptoms

13

may improve over time with adequate treatment, but that he would be unlikely to be able to maintain employment over the next year. A.R. 511.

Dr. Ratto assessed diagnoses of major depressive disorder (severe, recurrent, with some psychotic features) and PTSD. A.R. 510. She ruled out schizoaffective disorder and noted Reese's history of a learning disorder. A.R. 510. She assessed a GAF score of 40.[7] A.R. 510.

### 5. Lesleigh Franklin, PhD

On July 24, 2013, Lesleigh Franklin, PhD, completed a psychological assessment. A.R. 522. She observed that Reese was sufficiently groomed and wearing clean clothing but smelled distinctly of body odor. A.R. 525. He presented as cooperative and oriented, and he maintained an average amount of eye contact. A.R. 525. He demonstrated "somewhat circumstantial thought processing," and exhibited rapid speech and animated movement. A.R. 525. Reese's mood was elevated and "somewhat expansive," although his affect at times appeared inappropriate. A.R. 525. Dr. Franklin opined that Reese was a good historian and demonstrated moderate insight, but he appeared to have difficulty with his judgment. A.R. 525.

During the clinical interview, Reese recounted his childhood history, including the abuse and neglect he experienced from his adoptive mother. A.R. 523. He also reviewed his sporadic employment history, which included mostly part-time or temporary jobs, some of which ended due to difficulties he encountered with his supervisors. A.R. 523. Reese reported that he had not held a job since being fired from the California Conservation Corps around 2011. A.R. 523. With respect to his substance use, Reese told Dr. Frankly that he has a medical marijuana card and uses marijuana daily to help regulate his mood. A.R. 524. He admitted that he has used cocaine and ecstasy in the past but stopped after about a year. A.R. 524. Reese stated that he occasionally uses alcohol in social settings, but generally does not "care for it." A.R. 524.

With regard to his mental health history, Reese told Dr. Franklin that he has suffered from severe depression since he was a child. A.R. 524. Around the time he was 18, he began noticing

---

[7] A GAF score between 31 and 40 indicates "[s]ome impairment in reality or communication (e.g., speech is at times illogical, obscure, or irrelevant OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (e.g., depressed man avoids friends, neglects family, and is unable to work, child frequently beats up younger children, is defiant at home, and is failing at school)." DSM-IV, at 34.

shifts in his mood, which started fluctuating between extreme highs and extreme lows. A.R. 524. He reported that he occasionally experienced periods of no sleep, heightened irritability, and an increase in risk-taking behavior. A.R. 524. Reese stated that he has experienced suicidal ideation in the past but said that he would never follow through on those thoughts. A.R. 524. He told Dr. Franklin that he had never been hospitalized for mental health issues but has received mental health services including therapy throughout most of his life. A.R. 525. He said he had previously been prescribed Zoloft, trazadone, and Seroquel, but was not currently taking any medication other than marijuana. A.R. 525.

Dr. Franklin performed a series of tests, including the Mini-Mental State Examination ("MMSE"); Miller Forensic Assessment of Symptoms Test ("M-FAST"); Minnesota Multiphasic Personality Inventory – Second Edition, Restructured Form ("MMPI-2-RF"); Repeatable Battery for the Assessment of Neuropsychological Status-Booklet A ("RBANS-A"), Behavior Rating Inventory of Executive Function – Adult Version ("BRIEF"); WAIS-IV; BDI-II; and Beck Anxiety Inventory ("BAI"). A.R. 522. She noted that Reese put forth good effort on all assessment tests and was not malingering. A.R. 525, 528.

The WAIS-IV revealed that Reese falls within the average range of intellectual functioning, at the 39th percentile, although his non-verbal abilities are significantly less developed than his verbal skills. A.R. 526. On the RBANS-A, Reese scored in the 1st percentile on the attention assessment, placing him in the extremely low range. A.R. 526-27. The BRIEF-A placed Reese in the 99th percentile on the Behavioral Regulation Index, indicating that Reese has "significant difficulty in behavioral and emotional regulation." A.R. 527. He also scored in the 99th percentile on the MI Index, indicating that he likely has "extreme difficulties in cognitively managing attention and problem solving." A.R. 527. Overall, Reese's executive functioning ability was assessed at the 99th percentile, which is "indicative of severe deficits in executive function and suggests significant impairments in [his] ability to perform general activities of daily life." A.R. 527.

Reese scored within the low average range on the RBANS Immediate Memory Index, suggesting that he has "some difficulties remembering things he hears once, with slight improvement in recollection following repetition." A.R. 527. His performance on the RBANS

Delayed Memory Index was "similarly impaired," showing that he has impaired ability to encode and retrieve small amounts of information. A.R. 527-28. On the language measures of the RBANS, Reese scored in the 79th percentile, which falls within the high average range. A.R. 528. His visual-spatial abilities were assessed at the 0.4 percentile, placing him in the extremely low range. A.R. 528. Overall, Reese tested within the 5th percentile on the RBANS, indicating a borderline range of neurocognitive functioning. A.R. 528. While his language skills were comparatively high, he "demonstrated extremely poor performance on the visuospatial/constructional and attention measures of the test as well as slightly impaired performance on the memory measures." A.R. 528.

The emotional regulation measures showed ongoing symptoms associated with posttraumatic stress, anxiety, and mood dysregulation. A.R. 529. Reese appeared extremely restless and agitated, and had difficulty maintaining focus. A.R. 529. He reported not being able to relax, feeling nervous, and afraid of losing control. A.R. 529. He also stated that he is constantly irritable, extremely indecisive, and increasingly self-critical. A.R. 529. His posttraumatic stress symptoms include hypervigilant behaviors, heightened startle response, easily provoked anger, and feeling on edge. A.R. 529. Reese told Dr. Franklin that he generally dislikes being around a lot of people, although occasionally he seeks out and enjoys social interactions. A.R. 529. Dr. Franklin opined that Reese is liable to feeling hopeless, extremely unhappy, and dissatisfied with his life. A.R. 529. Reese also reported problems with his memory and concentration, which Dr. Franklin noted were corroborated by his cognitive assessment measures. A.R. 529.

With respect to Reese's limitations, Dr. Franklin opined that Reese has mild impairment in his social functioning; moderate impairment in his short-term memory, long-term memory, judgment, insight, and activities of daily living ("ADLs"); and severe impairment in his attention, concentration, motor/praxis, visual and spatial organization, and executive functioning. A.R. 532. She stated that he had "fair" ability to understand, remember, and carry out both simple and complex instructions, and "poor" ability to maintain concentration, attention, and persistence; perform activities within a schedule and maintain regular attendance; complete a normal workday and workweek without interruptions from psychologically based symptoms; and respond appropriately to changes in the workplace. A.R. 532.

16

Dr. Franklin concluded that the neuropsychological testing indicated that Reese experiences severe dysfunction in information retention, maintaining attention and concentration, visuospatial processes, and executive functioning tasks. A.R. 531. She stated that his thought processing tends to be circumstantial and he demonstrate difficulty maintaining relevance in conversation, although he is eventually able to return to the appropriate topic. A.R. 531. Dr. Franklin opined that Reese would likely have extreme difficulties in the workplace, including with simple and complex instructions, multitasking, maintaining concentration and focus, and with interpersonal relationships. A.R. 531. She stated that Reese's ability to secure stable employment and support himself financially "are very much impaired." A.R. 531.

### 6.    Katerina Steer, LCSW

On November 1, 2012, LCSW Katerina Steer performed an employability assessment. A.R. 492-96. Reese told Steer that he has "very high anxiety" and "get[s] into depression or stupors." A.R. 492. Steer noted that Reese presented with anxiety symptoms, endorses intrusive thoughts, experiences flashbacks, and is easily triggered by people who are angry or when he perceives sudden arm and hand movements in his direction. A.R. 492. She wrote that Reese "has a sense of detachment and he is mistrustful of others as well as concerned about his safety." A.R. 492. Reese also reported psychotic experiences to her and said that he had a history of hearing voices when he was younger. A.R. 492, 494.

Reese stated that he has low energy, inconsistent sleep, diminished concentration, variable memory, and a fluctuating appetite. A.R. 493. He reported that he has no close friends. A.R. 493. He said that he occasionally drinks alcohol and uses marijuana daily. A.R. 493. He stated that marijuana "keeps my blood pressure down and clears my mind." A.R. 493. At the time of the assessment, Reese was taking Zoloft and trazadone, although he complained that trazadone gave him nightmares. A.R. 493.

Steer noted that Reese was casually dressed and had "marginal" hygiene. A.R. 494. His demeanor was alert, oriented, friendly, engaged, talkative, and immature. A.R. 494. His mood seemed depressed, anxious, irritable, and angry. A.R. 494. Reese exhibited nervous laughter, but he was smiling and maintained a direct gaze. A.R. 494. Steer wrote that Reese's thought process

seemed organized and concrete, and although he made vague statements, they were appropriate to the subject. A.R. 494. She also noted that his insight and judgment seemed impaired, but his impulse control was intact. A.R. 494.

With respect to Reese's limitations, Steer assessed moderate impairment in the following areas: ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted by them; ask simple questions or request assistance; and respond appropriately to changes in a routine work setting. A.R. 544. She opined that he had marked limitation in his ability to maintain attention for two hour segments or longer; maintain regular attendance and punctuality; work in coordination with or proximity to others without being unduly distracted by them complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform consistent pace without an unreasonable number and length of rest periods. A.R. 544.

Steer assessed diagnoses of major depressive disorder, PTSD, and psychosis (not otherwise specified), and ruled out schizophrenia. A.R. 495. She opined that Reese would benefit from psychiatric evaluation and treatment, as well as from supportive therapy and possible vocational counseling. A.R. 495. She wrote that he is not able to seek and maintain gainful employment. A.R. 495. Steer assessed a GAF score of 43. A.R. 495.

### 7. State Agency Medical Consultants

On August 9, 2013, state agency medical consultant Stephen A. Whaley, M.D., reviewed the record. A.R. 53-64. Dr. Whaley did not make any findings regarding Reese's RFC. Instead, the disability determination explanation states that Reese failed to attend two consultative examinations set up with state medical examiners. A.R. 63. It also noted that Reese had not responded to any attempts to contact him. A.R. 63. The August 13, 2013 letter denying Reese's claim states that the agency did not have enough information to determine Reese's disability status since he had not appeared for the consultative examinations, and that the examinations were necessary to fully evaluate Reese's condition. A.R. 89.

On January 13, 2014, state agency psychological consultant Hillary Weiss, PhD, reviewed

the record on reconsideration. A.R. 65-84. Dr. Weiss determined that Reese has moderate impairments in the following areas: (1) maintain attention and concentration for extended periods; (2) work in coordination with or in proximity to others without being distracted by them; (3) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (4) interact appropriately with the general public; (5) get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (6) maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness; and (7) respond appropriately to changes in the work setting. A.R. 81-82.

## IV.   STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits. "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted). Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a mere scintilla, but less than a preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir.1996) (internal citation omitted). When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Soc. Sec. Admin*., 466 F.3d 880, 882 (9th Cir. 2006) (citation and quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V. ISSUES PRESENTED

Reese challenges the ALJ's decision on several grounds. He argues that the ALJ erred (1) in weighing the medical evidence; (2) in assessing Reese's credibility; (3) in failing to find that Reese's impairments meet or medically equals any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 416.920(d)); (4) in assessing his RFC; and (5) in considering the materiality of Reese's drug and alcohol use.

## VI. DISCUSSION

### A. Weighing of the Medical Evidence

The ALJ discussed the medical evidence and stated that he gave great weight to the opinions of the state agency consultants, and no weight to the opinions of Dr. Ratto, Dr. Franklin, and LCSW Steer. A.R. 27. Reese argues that the ALJ erred in assigning too little weight to the opinions of these examining medical sources, and too much weight to the opinions of the state agency consultants.

#### 1. Legal Standard

Courts employ a hierarchy of deference to medical opinions based on the relation of the doctor to the patient. Namely, courts distinguish between three types of physicians: those who treat the claimant ("treating physicians") and two categories of "nontreating physicians," those who examine but do not treat the claimant ("examining physicians") and those who neither examine nor treat the claimant ("non-examining physicians"). *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995); *see also* 20 C.F.R. § 404.1527.[8] A treating physician's opinion is entitled to more weight than an examining physician's opinion, and an examining physician's opinion is entitled to more weight than a non-examining physician's opinion. *Id*.

The Social Security Act tasks the ALJ with determining credibility of medical testimony and resolving conflicting evidence and ambiguities. *Reddick*, 157 F.3d at 722. A treating physician's

---

[8] This code section applies to claims filed prior to March 27, 2017. For claims filed on or after March 27, 2017, the rules of 20 C.F.R. 1520c apply. The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from your medical sources." 20 C.F.R. § 404.1520c. However, as the claim in this case was filed before March 27, 2017, the court analyzes the claim pursuant to the standard articulated in 20 C.F.R. § 404.1527.

opinion, while entitled to more weight, is not necessarily conclusive.  *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989) (citation omitted).  To reject the opinion of an uncontradicted treating physician, an ALJ must provide "clear and convincing reasons."  *Lester*, 81 F.3d at 830; *see, e.g.*, *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995) (affirming rejection of examining psychologist's functional assessment which conflicted with his own written report and test results); *see also* 20 C.F.R. § 416.927(d)(2); SSR 96-2p, 1996 WL 374188 (July 2, 1996).  If another doctor contradicts a treating physician, the ALJ must provide "specific and legitimate reasons" supported by substantial evidence to discount the treating physician's opinion.  *Lester*, 81 F.3d at 830.  The ALJ meets this burden "by setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Reddick*, 157 F.3d at 725 (citation omitted).  "[B]road and vague" reasons do not suffice.  *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989).  This same standard applies to the rejection of an examining physician's opinion as well.  *Lester*, 81 F.3d at 830-31.  A non-examining physician's opinion alone cannot constitute substantial evidence to reject the opinion of an examining or treating physician, *Pitzer v. Sullivan*, 908 F.2d 502, 506 n.4 (9th Cir. 1990); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984), though a non-examining physician's opinion may be persuasive when supported by other factors.  *See Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (noting that opinion by "non-examining medical expert . . . may constitute substantial evidence when it is consistent with other independent evidence in the record"); *Magallanes*, 881 F.2d at 751-55 (upholding rejection of treating physician's opinion given contradictory laboratory test results, reports from examining physicians, and testimony from claimant).  An ALJ "may reject the opinion of a non-examining physician by reference to specific evidence in the medical record."  *Sousa*, 143 F.3d at 1244.  An opinion that is more consistent with the record as a whole generally carries more persuasiveness. *See* 20 C.F.R. § 416.927(c)(4).

### 2.      Analysis

Dr. Ratto and Dr. Franklin each performed consultative psychological evaluations on March 13, 2013 and July 24, 2013, respectively.  The ALJ discussed these opinions and gave them no weight in favor of the opinions of the Dr. Weiss, the state agency psychiatric consultant at the

reconsideration level.[9]  Given that Dr. Weiss contradicted the findings of the examining psychologists and assessed lower limitations for Reese's RFC, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to reject the opinions of the examining psychologists.  *Lester*, 81 F.3d at 830.

LCSW Steer also completed an assessment assessing more serious limitations than those assigned by Dr. Weiss.  Social workers are not considered "acceptable medical sources" under the regulations.  *Kelly v. Astrue*, 471 F. App'x 674, 676 (9th Cir. 2012) (citing 20 C.F.R. § 404.1513(a)).  Rather, they are "other sources" of evidence, and their opinions are not entitled to the same weight as those of "acceptable medical sources."  *Id*.  As such, their opinions are reviewed under the same standard used to evaluate lay witness testimony.  *Turner v. Comm'r of Soc. Sec*., 613 F.3d 1217, 1224 (9th Cir. 2010).  To discount the opinion of a social worker, the ALJ need only provide "reasons germane to each witness for doing so." *Kelly*, 471 F. App'x at 676 (quoting *Turner*, 613 F.3d at 1223-24).  Accordingly, the ALJ was required to provide "germane reasons" to reject Steer's opinion.

### a.    Ratto Opinion

On March 13, 2013, Rosemarie Ratto, PhD, performed a psychological evaluation.  A.R. 507-12.  She reviewed the available documentary evidence, including some of Reese's school records, an employment assessment, and various treatment records.  A.R. 507.  She administered a battery of tests, which indicated several major deficits in Reese's cognitive function.  The WAIS-IV revealed that Reese has "significant weaknesses [in] his ability to retain information, concentrate, and pay attention."  A.R. 510.  Similarly, the Bender-Gestalt II showed that Reese's overall immediate memory fell in the bottom 10% range.  A.R. 510.

Dr. Ratto assessed functional limitations in several areas.  She opined that Reese has mild to moderate impairments in his ability to understand, remember, and carry out short and simple instructions and his ability to maintain adequate pace and persistence to perform simple tasks.  A.R.

---

[9] The ALJ states that he gave "great weight" to the opinions of both state agency medical consultants; however, as Reese notes, Dr. Whaley did not make any findings regarding Reese's RFC at the initial level of consideration and Reese's first disability denial merely stated that the agency did not have enough information to determine Reese's disability status since he had not appeared for the state consultative examinations.  A.R. 63, 89.

511. She noted that he has moderate to marked impairments in his ability to understand, remember, and carry out detailed instructions. A.R. 511. She also opined that he has marked limitation in the following areas: ability to maintain adequate pace and persistence to perform complex or detailed tasks; adapt to changes in job routine; withstand the stress of a routine work day; and interact appropriately with coworkers, supervisors, and the public on a regular basis. A.R. 511.

Dr. Ratto opined that the identified cognitive impairments may be due to Reese's severe feelings of depression and anxiety as well as documented long-term cognitive deficits. A.R. 510. She noted that Reese's emotional and cognitive problems appear long-term, beginning in childhood, and are "likely related to past organic issues as well as abuses that have occurred throughout his life." A.R. 511. She opined that Reese's symptoms may improve over time with adequate treatment, but that he would be unlikely to be able to maintain employment over the next year. A.R. 511. Dr. Ratto assessed diagnoses of major depressive disorder (severe, recurrent, with some psychotic features) and PTSD. A.R. 510. She ruled out schizoaffective disorder and noted Reese's history of a learning disorder. A.R. 510. She assessed a GAF score of 40. A.R. 510.

The ALJ assigned no weight to Dr. Ratto's opinion because it was a "one-time snapshot of the claimant's impairments and the findings are inconsistent with the treating records, including the generally unremarkable mental status examinations, sporadic and conservative treatment, and GAF scores of the claimant's treatment providers." A.R. 26-27. He also stated that Dr. Ratto "failed to address the impact of the claimant's regular and continuing use of marijuana since childhood on his mental health and on the severity of the limitations she opined." A.R. 27. Given that Dr. Ratto is an examining physician and her opinion is contradicted by the opinion of Dr. Weiss, the ALJ was required to provide "specific and legitimate reasons" supported by substantial evidence to discount her opinion. *Lester*, 81 F.3d at 830. Upon review of the record, the court concludes that the ALJ did not err with respect to Dr. Ratto's opinion.

The ALJ discounted Dr. Ratto's opinion on the basis that her findings were inconsistent with the treating records. A.R. 26-27. The ALJ's characterization of Reese's mental status examinations as "generally unremarkable" is supported by substantial evidence. When Reese voluntarily admitted himself for psychiatric hospitalization in September 2012, the mental status exam recorded that his

mood was "anxious and angry." A.R. 477. However, the notes from his physical examination state that he appeared to be in "[m]ild distress," was "well spoken," and that his psychiatric state was appropriate. A.R. 467, 477. He was discharged the same day. A.R. 467. During his second voluntary hospitalization in October 2012, Reese presented with a depressed mood and "underlying sadness" but was cooperative and appropriately reactive. A.R. 479. He did not appear internally preoccupied, his thought process was linear, and he did not express any delusions. A.R. 479. Upon discharge the following day, he appeared cooperative, calm, alert and oriented, although his mood was somewhat depressed. A.R. 481. In Reese's April 2013 meeting with Ms. Rosenberg, he appeared clean, appropriately dressed, and oriented. A.R. 513. In May 2014, Dr. Pyevich also reported that Reese had a normal appearance, unremarkable behavior, intact memory, and fair judgment and insight. A.R. 547.

In addition, Dr. Ratto assessed a GAF score of 40, which is lower than any other GAF score appearing in the treating records. A.R. 510; *see* A.R. 480 (GAF of 60 assessed during Reese's second voluntary psychiatric hold); A.R. 514 (GAF of 55); A.R. 547 (GAF of 55). Although GAF scores on their own cannot "control determinations of whether a person's mental impairments rise to the level of a disability," *Garrison v. Colvin*, 759 F.3d 995, 1002 n. 4 (9th Cir. 2014), they "may be a useful measurement." *Id.* That the GAF scores assessed throughout Reese's treatment records are consistently higher than Dr. Ratto's lends support to the ALJ's conclusion. The ALJ could also reasonably conclude that Reese's "sporadic and conservative" treatment, in combination with the above factors, tends to show that Reese is more functional and in less distress than described by Dr. Ratto. Taken as a whole, the record substantially supports the ALJ's conclusion that Dr. Ratto's opinion is inconsistent with the available medical evidence. Accordingly, the ALJ did not err in discounting Dr. Ratto's opinion.

However, the two other reasons cited by the ALJ are not sustainable. To the extent that the ALJ's decision was based on the fact that Dr. Ratto administered a one-time examination, that rationale is insufficient to discount her opinion in favor of Dr. Weiss's. In *Lester*, the Ninth Circuit reviewed an ALJ's decision to discount the opinion of an examining psychologist in favor of a non-examining source because the examiner's conclusions were based on "limited observation" of the

claimant. *Lester*, 81 F.3d at 832. In holding that the ALJ erred, the court stated: "While this would be a reason to give less weight to [the examining psychologist's] opinion than to the opinion of a treating physician, it is not a reason to give preference to the opinion of a doctor who has *never* examined the claimant." *Id.* In this case, the ALJ discounted an examining source's opinion in favor of a non-examining source. There are no treating source opinions in the record. Under such circumstances, it is error to discredit an examining source opinion on the basis that it is a one-time examination. Accordingly, the court concludes that this is not a specific and legitimate reason supported by substantial evidence to reject Dr. Ratto's opinion.

Finally, the ALJ discounted Dr. Ratto's opinion on the basis that she "failed to address the impact of the claimant's regular and continuing use of marijuana since childhood on his mental health and on the severity of the limitations she opined." A.R. 27. Notably, the ALJ gave great weight to Dr. Weiss's opinion, which found that "[t]here is no evidence of any substance abuse disorder/[Drug Addiction and Alcoholism] issue." A.R. 84. Therefore, it is unclear what medical evidence, if any, the ALJ relied on in finding that Dr. Ratto's silence as to Reese's medical marijuana use undermined her opinions as to his mental limitations. In addition, Ninth Circuit caselaw makes clear that an ALJ must proceed through the five-step inquiry before considering the impact of drug or alcohol use on the claimant's impairments. *See Bustamante v. Massanari*, 262 F.3d 949, 955 (9th Cir. 2001). In *Bustamante*, the ALJ determined at Step Two that the claimant's mental limitations were "the product and consequence of his alcohol abuse and not an independently severe or disabling impairment." *Id.* at 955. The Ninth Circuit held that this was in error, and "[t]he ALJ should have proceeded with the five-step inquiry without attempting to determine the impact of [the claimant's] alcoholism on his other mental impairments." *Id.* Only if the ALJ found that the claimant was disabled should he have considered the impact of the claimant's alcohol use on his impairments. *Id.*

Here, the ALJ cited Reese's drug use as a reason to undermine Dr. Ratto's findings on his mental impairments. This was a premature inquiry; under *Bustamante*, the ALJ should have completed the five-step inquiry and then proceeded to consider Reese's drug use only if he found that Reese was disabled. Accordingly, this is not a specific and legitimate basis on which to reject

Dr. Ratto's opinion. However, as detailed above, the ALJ did not err in rejecting Dr. Ratto's opinion on other grounds.

### b. Franklin Opinion

On July 24, 2013, Dr. Franklin completed a psychological assessment. A.R. 522. She also administered a wide range of tests and noted that Reese put forth good effort on the tests and did not appear to be malingering. A.R. 525, 528. Reese again tested at an average range of intellectual functioning, although Dr. Franklin found that his non-verbal abilities are significantly less developed than his verbal skills. A.R. 526. On the RBANS-A, Reese scored in the 1st percentile on the attention assessment, placing him in the extremely low range. A.R. 526-27. The BRIEF-A placed Reese in the 99th percentile on the Behavioral Regulation Index, indicating that Reese has "significant difficulty in behavioral and emotional regulation." A.R. 527. He also scored in the 99th percentile on the MI Index, indicating that he likely has "extreme difficulties in cognitively managing attention and problem solving." A.R. 527. Reese tested within the 5th percentile on the RBANS, indicating a borderline range of neurocognitive functioning. A.R. 528. Overall, Reese's executive functioning ability was assessed at the 99th percentile, which is "indicative of severe deficits in executive function and suggests significant impairments in [his] ability to perform general activities of daily life." A.R. 527.

Dr. Franklin opined that Reese has mild impairment in his social functioning; moderate impairment in his short-term memory, long-term memory, judgment, insight, and activities of daily living ("ADLs"); and severe impairment in his attention, concentration, motor/praxis, visual and spatial organization, and executive functioning. A.R. 532. She stated that he had "fair" ability to understand, remember, and carry out both simple and complex instructions, and "poor" ability to maintain concentration, attention, and persistence; perform activities within a schedule and maintain regular attendance; complete a normal workday and workweek without interruptions from psychologically based symptoms; and respond appropriately to changes in the workplace. A.R. 532. She concluded that Reese experiences severe dysfunction in information retention, maintaining attention and concentration, visuospatial processes, and executive functioning tasks and opined that he would likely have extreme difficulties in a workplace setting. A.R. 531.

The ALJ assigned no weight to Dr. Franklin's opinion. A.R. 27. The reasons he gave for discounting Dr. Franklin's opinion are identical to the reasons he gave for Dr. Ratto: (1) the assessment was a "one-time snapshot" of Reese's impairments; (2) the findings were "inconsistent with the treating records, including the generally unremarkable mental status examinations, sporadic and conservative treatment, and GAF scores of the claimant's treatment providers;" and (3) Dr. Franklin "failed to address the impact of the claimant's regular and continuing use of marijuana since childhood on his mental health and on the severity of the limitations she opined." A.R. 27.

For the reasons offered above with respect to Dr. Ratto's opinion, the ALJ did not err in discounting Dr. Franklin's opinion on the basis that it is inconsistent with the medical evidence of record. While the other reasons given are less convincing, there is substantial evidence supporting the ALJ's conclusion.

Accordingly, the court holds that the ALJ did not err in evaluating Dr. Franklin's opinion.

### c. Steer Opinion

On November 1, 2012, LCSW Steer performed an employability assessment. A.R. 492-96, 544-45. Steer assessed moderate impairment in the following areas: ability to remember work-like procedures; understand, remember, and carry out very short and simple instructions; sustain ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted by them; ask simple questions or request assistance; and respond appropriately to changes in a routine work setting. A.R. 544. She opined that he had marked limitation in his ability to maintain attention for two hour segments or longer; maintain regular attendance and punctuality; work in coordination with or proximity to others without being unduly distracted by them complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform consistent pace without an unreasonable number and length of rest periods. A.R. 544. Steer noted that Reese's insight and judgment seemed impaired. A.R. 494. She wrote that he is not able to seek and maintain gainful employment, and assessed a GAF score of 43. A.R. 495.

The ALJ assigned no weight to Steer's assessment because her opinion was inconsistent with the treatment notes, including the "generally unremarkable mental status examinations, sporadic and

conservative treatment, and GAF scores of the claimant's treatment providers." A.R. 27. To discount the opinion of a social worker, the ALJ need only provide "reasons germane to each witness for doing so.'" *Kelly*, 471 F. App'x at 676 (quoting *Turner*, 613 F.3d at 1223-24)

There is nothing in the record that supports that Steer actually treated Reese. It is unclear what records, if any, Steer reviewed prior to the single assessment she conducted. She took down Reese's self-reported symptoms and medical history and completed a check-the-box assessment of Reese's functional limitations, without further explanation or evidence as to those limitations. A.R. 544-45. *See* 20 C.F.R. § 404.1527(c)(1)-(2) (opinions from treating sources given greater weight where they provide a "detailed, longitudinal picture" of the medical impairments and present "relevant evidence to support a medical opinion"). Further, the ALJ's conclusion that the limitations assessed are not consistent with the record is supported by substantial evidence, as laid out above.

Accordingly, the court concludes that the ALJ did not err in evaluating Steer's opinion.

## B. Reese's Credibility

The ALJ found that Reese's subjective reports of the extent of his limitations were "generally unsupported" by the record. A.R. 26. Reese argues that the ALJ erred in discounting his credibility, while the Commissioner maintains that the ALJ's reasons were sufficient to support an adverse credibility determination.

### 1. Legal Standard

In general, credibility determinations are the province of the ALJ. "It is the ALJ's role to resolve evidentiary conflicts. If there is more than one rational interpretation of the evidence, the ALJ's conclusion must be upheld." *Allen v. Sec'y of Health & Human Servs.*, 726 F.2d 1470, 1473 (9th Cir. 1984) (citations omitted). An ALJ is not "required to believe every allegation of disabling pain" or other nonexertional impairment. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir.1989) (citing 42 U.S.C. § 423(d)(5)(A)). However, if an ALJ discredits a claimant's subjective symptom testimony, the ALJ must articulate specific reasons for doing so. *Greger v. Barnhart*, 464 F.3d 968, 972 (9th Cir. 2006). In evaluating a claimant's credibility, the ALJ cannot rely on general findings, but "must specifically identify what testimony is credible and what evidence undermines the claimant's complaints." *Id.* at 972 (quotations omitted); *see also Thomas v. Barnhart*, 278 F.3d 947,

958 (9th Cir. 2002) (ALJ must articulate reasons that are "sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's testimony."). The ALJ may consider "ordinary techniques of credibility evaluation," including the claimant's reputation for truthfulness and inconsistencies in testimony, and may also consider a claimant's daily activities, and "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen v. Chater*, 80 F.3d 1273, 1284 (9th Cir. 1996).

The determination of whether or not to accept a claimant's testimony regarding subjective symptoms requires a two-step analysis. 20 C.F.R. §§ 404.1529, 416.929; *Smolen*, 80 F.3d at 1281 (citations omitted). First, the ALJ must determine whether or not there is a medically determinable impairment that reasonably could be expected to cause the claimant's symptoms. 20 C.F.R. §§ 404.1529(b), 416.929(b); *Smolen*, 80 F.3d at 1281-82. Once a claimant produces medical evidence of an underlying impairment, the ALJ may not discredit the claimant's testimony as to the severity of symptoms "based solely on a lack of objective medical evidence to fully corroborate the alleged severity of" the symptoms. *Bunnell v. Sullivan*, 947 F.2d 341, 345 (9th Cir. 1991) (en banc) (citation omitted). Absent affirmative evidence that the claimant is malingering, the ALJ must provide "specific, clear and convincing" reasons for rejecting the claimant's testimony. *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009). The Ninth Circuit has reaffirmed the "specific, clear and convincing" standard applicable to review of an ALJ's decision to reject a claimant's testimony. *See Burrell v. Colvin*, 775 F.3d 1133, 1136 (9th Cir. 2014).

### 2. Analysis

In evaluating Reese's credibility, ALJ found that Reese's medically determinable impairments "could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record . . . ." A.R. 24. He gave several specific reasons for finding Reese's allegations "generally unsupported": (1) Reese has received "infrequent and conservative" treatment; (2) he "reported improvement in his psychiatric symptoms with medication but has repeatedly stopped taking it"; and (3) he failed to appear for two scheduled consultative examinations.

29

With respect to Reese's "infrequent and conservative" treatment, the ALJ correctly noted that the treatment records are sparse. Reese's alleged onset date is December 15, 2011, but his medical records do not reflect any treatment until September 5, 2012. A.R. 461-65. After his two voluntary psychiatric holds in September and October 2012, Reese next appeared for treatment in February 2013. A.R. 513-16. He had at least one appointment with social worker Ms. Rosenberg in April 2013, but there is no evidence that Reese continued to receive psychotherapy after that point. A.R. 513-14. He returned to treatment in May 2014, and his last medical record is dated July 24, 2014. A.R. 546-47.

The Ninth Circuit has held that, in assessing a claimant's credibility, an ALJ may consider "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284. A claimant's statements "may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure." SSR 96-7p; *see also Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (holding that the ALJ did not err in discounting a claimant's credibility where there was "no medical evidence that [the claimant's] resistance was attributable to her mental impairment than her own personal preference").

Here, Reese relies on *Nguyen v. Chater*, 100 F.3d 1462 (9th Cir. 1996) for the proposition that "it is a questionable practice to chastise one with a mental impairment for the exercise of poor judgment in seeking rehabilitation." *Id.* at 1465 (quoting *Blankenship v. Bowen*, 874 F.2d 1116, 1124 (6th Cir. 1989)). However, he does not explain how his specific impairments precluded him from seeking treatment or following the treatments he was prescribed. He also does not point to any medical evidence in the record that shows that his failure to seek treatment is due to his mental impairments. In addition, Reese argues that he "was indigent at all times relevant to the case," but does not state whether he has access to Medicaid or other resources that would permit him to seek medical treatment. Pltf. Mot. at 18. Accordingly, the ALJ did not err in finding that Reese's lack of consistent treatment undermines his credibility.

The ALJ also found Reese's allegations less credible because "reported improvement in his

psychiatric symptoms with medication but has repeatedly stopped taking it." A.R. 26. In September 2009, Reese was prescribed Zoloft and trazadone. A.R. 459. Later that month, he reported that the "medications work perfect" and that he was able to sleep at night. A.R. 447. He appeared for a medication refill on October 14, 2009, and again said that the medications were working well. A.R. 441. On October 31, 2009, Reese reported that the medication was too strong and that Zoloft gave him hallucinations. A.R. 435. The provider told Reese he could decrease his dosage of both medications but refilled the prescriptions for both. A.R. 439-40. In October 2012, Reese told a treating provider that he had not taken psychiatric medication for a year and a half. A.R. 479. In April 2013, he again reported that he was not taking medication. A.R. 513. When Reese presented for treatment in May 2014, he was restarted on Zoloft and referred for a psychiatric intake. A.R. 554. In July 2014, Reese met with Dr. Pyevich and told him that he had recently increased his dose of Zoloft with a positive response. A.R. 546.

Reese argues that "[c]ycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working." Pltf. Mot. at 18 (quoting *Garrison*, 759 F.3d at 1017. However, he makes no effort to explain how that statement applies in his case, where there are no apparent "cycles" of improvement and deterioration. Although the medical evidence is sparse, the available records substantially support the ALJ's conclusion that Reese's condition improved with medication. Therefore, this is a clear and convincing reason to discount Reese's credibility.

Finally, the ALJ noted that Reese missed two consultative examinations with state agency examiners. A.R. 41. The regulations state: "If you are applying for benefits and do not have a good reason for failing or refusing to take part in a consultative examination or test which we arrange for you to get information we need to determine your disability or blindness, we may find that you are not disabled or blind." 20 C.F.R. § 416.918(a); *Zamora v. Comm'r of Soc. Sec. Admin.*, 471 F. App'x 579, 580 (9th Cir. 2012) (holding that "the ALJ did not err in discounting [the claimant's] credibility due to her failure to attend either of two scheduled consultative evaluations"). "[T]he ALJ may make a negative disability determination based solely on [the claimant's] failure to appear"

at consultative examinations arranged by the agency unless there is good cause for the failure. *Payne v. Comm'r of Soc. Sec.*, No. 12-cv-04909-WHA, 2013 WL 6623347, at *5 (N.D. Cal. Dec. 16, 2013); *cf. McCann v. Astrue*, No. CV 09-01432 SS, 2010 WL 2803964, at *4 (C.D. Cal. July 15, 2010) (finding that the ALJ was "entitled to deny Plaintiff's application for benefits" where "[n]either Plaintiff nor her attorney have established, or even attempted to argue, that she had 'good cause' for missing the scheduled appointments").

Reese notes that both state agency disability adjudicators stated that a consultative examination was not necessary. Reply at 7; *see also* A.R. 62 (initial); 77 (reconsideration). Therefore, Reese argues, his failure to appear for them cannot be used either as a basis to deny his claim or to discount his credibility. Reply at 7-8 (citing 20 C.F.R. § 404.1519a). If, as the disability adjudicators indicated, the consultative examinations were not necessary for a determination of disability, then the case for denying Reese's claim on the basis that he missed those appointments is less compelling. However, the ALJ did not rely on Reese's failure to appear for the examinations as a reason to deny Reese's claim but rather to discount Reese's credibility. As examined above, an ALJ may properly discount a claimant's credibility due to his failure to attended scheduled consultative exams. *Zamora*, 471 F. App'x at 580.

In sum, the ALJ did not err in evaluating Reese's credibility.

**C.    Listings**

Reese argues that the ALJ erred in failing to find that any of his impairments is medically equivalent to a Listing.

### 1.    Legal Standard

At step three of the sequential evaluation process, the ALJ considers the medical severity of the claimant's impairments. If the claimant has an impairment that meets or equals one of the listings in 20 C.F.R., Pt. 404, Subpt. P, App. 1 and meets the duration requirement, the ALJ will find that the claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(iii). "The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990) (emphasis in original). "To *meet* a listed impairment, a claimant must establish that he or

she meets each characteristic of a listed impairment relevant to his or her claim." *Tackett v. Apfel*, 180 F.3d 1094, 1099 (9th Cir. 1999) (emphasis in original). "To *equal* a listed impairment, a claimant must establish symptoms, signs and laboratory findings 'at least equal in severity and duration' to the characteristics of a relevant listed impairment . . . ." *Id.* at 1099 (emphasis in original) (quoting 20 C.F.R. § 404.1526(a)). "If a claimant suffers from multiple impairments and none of them individually meets or equals a listed impairment, the collective symptoms, signs and laboratory findings of all of the claimant's impairments will be evaluated to determine whether they meet or equal the characteristics of any relevant listed impairment." *Id.* (citing 20 C.F.R. § 404.1526(a)). However, "'[m]edical equivalence must be based on medical findings,'" and "[a] generalized assertion of functional problems is not enough to establish disability at step three.'" *Id.* at 1100 (quoting 20 C.F.R. § 404.1526(a)).

The claimant bears the burden of establishing a prima facie case of disability under the listings. *Thomas v. Barnhart*, 278 F.3d 947, 955 (9th Cir. 2002); *see also* 20 C.F.R. § 404.1520(a)(4)(iii). "[I]n determining whether a claimant equals a listing under step three of the . . . disability evaluation process, the ALJ must explain adequately [the ALJ's] evaluation of alternative tests and the combined effects of the impairments." *Marcia v. Sullivan*, 900 F.2d 172, 176 (9th Cir. 1990).

### 2.    Analysis

Reese asserts that "the ALJ failed to address medical equivalence in any meaningful way" and that the ALJ's "failure to explain the combined effects of [Reese's] impairments is legal error." Pltf. Mot. at 17. However, "[a]n ALJ is not required to discuss the combined effects of a claimant's impairments or compare them to any listing in an equivalency determination, unless the claimant presents evidence in an effort to establish equivalence." *Burch v. Barnhart*, 400 F.3d 676, 683 (9th Cir. 2005). Reese does not articulate how the medical evidence establishes an equivalency determination; he merely asserts that the ALJ's assertions regarding the Listings are conclusory. However, it is Reese's burden to make a prima facie showing that his impairments meet or equal a Listing; Reese's bare-bones arguments are insufficient to show error.

//

**D. RFC**

Reese asserts that the ALJ's RFC assessment is not supported by substantial evidence, and therefore the VE testimony was based on inaccurate hypotheticals about Reese's abilities.

### 1. Legal Standard

In determining a claimant's RFC at step four of the sequential analysis, an ALJ must consider "all of the relevant medical and other evidence" in the record, 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c), and must consider all of the claimant's "medically determinable impairments," including those that are not severe. 20 C.F.R. § 404.1545(a)(2); *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007). "[A]n RFC that fails to take into account a claimant's limitations is defective." *Valentine v. Comm'r. of Soc. Sec. Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).

### 2. Analysis

Reese argues that Dr. Weiss's opinion is the only "substantive medical evidence credited by the ALJ," and yet the ALJ improperly failed to account for the functional limitations imposed by Dr. Weiss in formulating Reese's RFC. Pltf. Mot. at 14-15. The RFC assessed by the ALJ included the following nonexertional limitations:

> [T]he claimant must avoid concentrated exposure to fumes, dust, and other lung irritants. He is limited to simple, routine, and repetitive tasks in a work environment free of fast-paced production work requirements involving only simple, work-related decision-making, with few, if any, workplace changes, and no interaction with the public.

A.R. 28. The ALJ gave great weight to the opinion of Dr. Weiss, the state agency psychological consultant at the reconsideration level. In fact, Dr. Weiss's opinion is the only one to which the ALJ assigned any weight. He characterized her opinion as saying that "the claimant is able to perform simple, routine tasks, with no public contact." A.R. 27.

Reese contends that, despite giving great weight to Dr. Weiss's opinion, the ALJ did not account for all the moderate limitations found by Dr. Weiss, including: the moderate limitations in Reese's ability to work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest

34

periods; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Pltf. Mot. at 15; *see also* A.R. 81-82. The Commissioner responds that the ALJ was only required to ask the VE about limitations he found credible. Def. Mot. at 19. This response is not on point because the ALJ did not explain why he omitted limitations assessed by Dr. Weiss, even though her opinion was the only one he credited.

Reese is correct that the ALJ's RFC fails to account for the moderate limitations assessed by Dr. Weiss. For example, the RFC says nothing about limiting contact with coworkers, even though Dr. Weiss assessed moderate limitations in Reese's abilities to work around others without being distracted by or distracting them. *See Samples v. Comm'r of Soc. Sec. Admin.*, 466 F. App'x 584, 586 (9th Cir. 2012) (holding an ALJ erred because a specific limitation in the ability to "accept instructions from supervisors and to respond appropriately to criticism from supervisors" is not covered by the general limitation of "difficulty with taking criticism in the workplace"). The RFC also does not account for Reese's moderate limitation in completing work without interruptions from psychologically based symptoms, such as a percentage of time that Reese may be expected to be off-task because of this limitation. Particularly given that Dr. Weiss's opinion is the only opinion credited by the ALJ, the ALJ's failure to incorporate the specific limitations assessed by Dr. Weiss is error. *See Valentine*, 574 F.3d at 690 ("[A]n RFC that fails to take into account a claimant's limitations is defective."); *see also Goytia v. Berryhill*, No. 14-cv-04498-EJD, 2017 WL 1150524, at *6 (N.D. Cal. Mar. 28, 2017) ("Having accepted [a medical source's] assessment of Plaintiff's moderate limitations, the ALJ was required to incorporate those limitations into an RFC at step four of the sequential analysis."). The court therefore will remand this case to the Commissioner for reconsideration of the Step Four analysis in a manner that is consistent with this opinion.

Further, the testimony offered by the VE is defective because it relied on an inaccurate RFC. *Matthews v. Shalala*, 10 F.3d 678, 681 (9th Cir. 1993) ("If a vocational expert's hypothetical does not reflect all of the claimant's limitations, then the expert's testimony has no evidentiary value to support a finding that the claimant can perform jobs in the national economy.") On remand, the hypothetical question posed by the ALJ must be reformulated to include all of Reese's limitations.

*See Samples*, 466 F. App'x at 586.

### E. Drug Addiction and Alcoholism ("DAA")

Reese argues that the ALJ erred in failing to conduct a DAA analysis to determine which of his disabling limitations would remain if the claimant stopped using drugs or alcohol. Pltf. Mot. at 19. The Commissioner responds that the DAA analysis is only appropriate once the ALJ determines that the claimant is disabled, and therefore should not be applied where, as here, the ALJ finds that the claimant does not have a disabling condition

#### 1. Legal Standard

When the record demonstrates that substance abuse has occurred in conjunction with an alleged disability, the ALJ may not find a claimant disabled "if alcoholism or drug addiction would . . . be a contributing factor material to the . . . determination that the individual is disabled." 42 U.S.C. § 1382c(a)(3)(J); *see* 20 C.F.R. § 416.935(a) & (b). In determining whether a claimant's DAA is material, the test is whether the individual would still be found disabled if he or she stopped using drugs or alcohol. *See* 20 C.F.R. §§ 404.1535(b), 416.935(b); *Parra v. Astrue,* 481 F.3d 742, 746-47 (9th Cir. 2007); *Sousa v. Callahan,* 143 F.3d 1240, 1245 (9th Cir. 1998). The ALJ must "evaluate which of [the claimant's] current physical and mental limitations . . . would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling." 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2). If the ALJ determines that the claimant's remaining limitations are disabling, then the claimant's DAA is not a material contributing factor to the determination of disability, and the claimant is disabled, independent of his or her DAA. *See* 20 C.F.R. §§ 404.1535(b)(2)(ii), 416.935(b)(2)(ii). The claimant has the burden of showing that he or she would qualify as disabled absent DAA. *See Parra*, 481 F.3d at 748.

Social Security Ruling ("SSR") 13-2p sets forth the procedure for evaluating cases involving DAA, which the ruling defines as "Substance Use Disorders; that is, Substance Dependence or Substance Abuse as defined in the latest edition of the Diagnostic and Statistical Manual of Mental Disorders (DSM) published by the American Psychiatric Association." SSR 13-2p, 2013 WL 621536, at *3. It instructs adjudicators to "apply the appropriate sequential evaluation process twice.

First, apply the sequential process to show how the claimant is disabled. Then, apply the sequential evaluation process a second time to document materiality[.]" *Id.* at *6. Although SSRs do not have the force of law, they "constitute Social Security Administration interpretations of the statute it administers and of its own regulations," and are given deference "unless they are plainly erroneous or inconsistent with the Act or regulations." *Han v. Bowen*, 882 F.2d 1453, 1457 (9th Cir. 1989).

SSR 13–2p(7) provides that where a claimant has co-occurring mental disorder(s), there must be "evidence in the case record that establishes that [the] claimant . . . would not be disabled in the absence of DAA" to support a DAA materiality determination. SSR 13–2p(7), 2013 WL 621536, at *9. The ALJ may not "rely exclusively on medical expertise and the nature of a claimant's mental disorder" to support a finding of DAA materiality. *Id.* Furthermore, DAA is not material "if the record is fully developed and the evidence does not establish that the claimant's co-occurring mental disorder(s) would improve to the point of nondisability in the absence of DAA." *Id.* Also, "[i]f the evidence in the case record does not demonstrate the separate effects of the treatment for DAA and for the co-occurring mental disorders," then the ALJ should find that the DAA is not material. *Id.* at *12.

### 2. Analysis

In this case, it is undisputed that Reese has used marijuana, cocaine, ecstasy, and heroin. A.R. 508. He informed Dr. Ratto that he stopped using cocaine, ecstasy, and heroin around the time he was 20, although he continued to use marijuana for medical purposes. A.R. 508. The ALJ assessed cannabis abuse/dependence and cocaine abuse as severe impairments. A.R. 22.

Reese argues that the ALJ should have engaged in a materiality analysis under SSR 13-2p to Reese's substance use disorders. A.R. 19. The Commissioner responds that the ALJ would only have the responsibility to engage in a DAA analysis if he had initially found that Reese was disabled and unable to work, which he did not. Def. Mot. at 18. Reese contends that the ALJ improperly relied on Reese's substance use to deny the claim even though he failed to perform a materiality analysis. Reply at 8.

The Commissioner is correct that the ALJ must conduct a materiality analysis only after determining that the claimant is disabled. *See Bustamante*, 262 F.3d at 955 ("If, and only if, the

ALJ found that [the claimant] was disabled under the five-step inquiry, should the ALJ have evaluated whether [he] would still be disabled if he stopped using alcohol."). As the ALJ did not find that Reese was disabled, he was not required to perform a materiality analysis. However, as explained above, the ALJ cannot consider the impact of Reese's substance use unless he first finds that Reese is disabled. Therefore, in reassessing Reese's RFC as outlined above, the ALJ should consider the effect of Reese's substance use on his impairments only if he finds Reese disabled and conducts a materiality analysis.

## VII. CONCLUSION

For the foregoing reasons, the court grants in part Reese's motion, denies the Commissioner's cross-motion, and remands this case for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Dated: September 27, 2019



Donna M. Ryu
United States Magistrate Judge